SIMPSON *v.* BIFFLE.

SIMPSON *v.* DOWNMAN.

Opinion delivered December 12, 1896.

| 63 | 289 |
| 69 | 114 |
| 63 | 289 |
| s74 | 594 |
| 74 | 596 |
| 63 | 289 |
| 81 | 330 |
| '63 | 289 |
| '89 | 23 |

EXECUTION SALE—REDEMPTION.—Where an execution debtor seeks to redeem his homestead from a sale under an execution to which it is subject, under sec. 3114, Sand. & H. Dig., providing for a redemption upon payment of the purchase money, with 15 per cent. interest and all lawful charges, he is not entitled to a credit on the purchase money for the surplus applied to pay off another execution, to which the homestead was not subject, held by a firm of which the purchaser was a member, as his claim against such firm for the surplus paid to it could not be set off against the claim of a member thereof who purchased in his individual right to receive the purchase money paid by him.

HOMESTEAD—EXEMPTION FROM JUDGMENT LIEN.—The occupation of premises as a homestead on a day subsequent to the rendition of a judgment against the owner does not relieve them of the lien of such judgment.

SAME—IN WHAT ESTATE.—A husband is entitled to claim his residence as a homestead, whether held by him with his wife as a tenant in common or by the entirety.

SAME—RENTING PART TO ANOTHER.—The fact that a part of a building is rented as a hotel does not divest the right of the owner of the premises, who occupies the remainder, to hold the premises as his homestead.

SAME—SALE ON EXECUTION—SURPLUS.—The surplus arising from a sale of premises under an execution on a judgment rendered before the occupation of the premises as a homestead is exempt from levy under an execution from a judgment rendered after such occupation, so long as the execution debtor intends to use it in acquiring another homestead, but the right of exemption is lost when he abandons the intention so to use it.

ESTOPPEL—SILENCE.—Where land is conveyed to a wife by deed, the subsequent insertion of her husband's name also as a grantee before the deed is recorded, with the consent of the grantor but without the wife's knowledge, does not divest her of any interest acquired by the deed, and her failure to take steps to correct the deed, after discovering the alteration, will not estop her from

asserting her title, as against a purchaser of the property under an execution against her husband who bought in reliance on the record title.

HUSBAND AND WIFE—TITLE IN ENTIRETY.—A conveyance of land to a husband and wife jointly vests in them an estate in entirety, and a sale of the husband's interest does not divest the wife of her right of possession during her lifetime.

Appeals from Clay Circuit Court in Chancery, and from Craighead Circuit Court, Jonesboro District.

FELIX G. TAYLOR, Judge.

*J. C. Hawthorne* for appellant.

The general rule is that money realized from a voluntary sale of the homestead or other exempt property is subject to execution. But where sold under an execution or at forced sale, the proceeds in excess of the amount required to satisfy the liens are exempt from seizure and sale under execution. 48 N. Y. 188; 86 Am. Dec. 707; 92 Am. Dec. 112; 22 N. E. Rep. 613; 93 Ill. 387. The surplus must be treated *as land.* 7 Wend. 259; 20 N. Y. 412; 2 Freem. Ex. 447; 29 Pa. St. 362; 33 Mich. 183; 38 *id.* 168; 51 Mich. 492; 10 S. W. Rep. 501; 7 Ill. App. 294. Husband may, as head of family, have a homestead exempt in property the title to which is in his wife. 9 Am. St. Rep. 326. When a homestead is limited to a certain sum, and is incapable of division, it may be sold, and the amount or value of the homestead reserved for the debtor. 93 Ill. 387; 112 *id.* 377; 1 Am. St. 554. We have no statute, but equity courts have inherent power to mould remedies so as to give effect to rights guaranteed by the constitution. Art. 9, sec. 3, Const. 1874; 41 Ark. 59; 1 Barb. Ch. 189; 3 *id.* 9; 86 Mass. 347; 1 Pomeroy, Eq. 111 *et seq.* The appellant had the right to redeem by paying the Peters judgment, interest and costs, and the tender was sufficient.

Mrs. Simpson is not estopped from claiming to be sole owner. 19 Am. St. 600; 39 Ark. 131; 49 *id.* 218; 50

*id.* 116; 10 Am. St. Rep. 307; 9 *id.* 587. Silence will not estop, unless there is not only a right but a duty to speak. 107 N. Y. 310; 10 N. E. Rep. 204; *ib.* 735; 4 Johns. Ch. 66; 4 N. E. Rep. 370; 32 Am. St. 784; 33 *id.* 105; 41 N. E. Rep. 1044. In view of these authorities, the court's charge was erroneous. All the essentials of an estoppel are wanting. Bigelow on Estoppel, 484. A party must be actually deceived or misled to his injury by the conduct of another, and the latter must *intend* that his conduct should be acted on. 5 Am. St. 49; 5 *id.* 285; 56 Ark. 217; 54 *id.* 465; 58 *id.* 20; 53 *id.* 545; 54 *id.* 196; 51 *id.* 62; 33 *id.* 465; 109 Mass. 53; 93 *id.* 349; 60 *id.* 4. As to omission to speak, see 82 N. Y. 33; 82 *id.* 327; 55 *id.* 325; 2 Wall. 24.

A husband's interest in an estate by entirety may be sold under an execution against him, but the purchaser only acquires an interest in one-half of the rents and profits, and cannot deprive the wife of the possession in an action at law. 33 S. W. Rep. 424; 39 N. E. Rep. 337; 35 Am. St. 182, and cases in note. If Mrs. Simpson was estopped from claiming to be the sole owner, she was entitled to retain possession of half during her life. 33 S. W. Rep. 424; 61 Ark. 388.

*G. B. Oliver* for appellee.

In Vermont, Illinois, Michigan and Tennessee, there are special statutes limiting the value of the homestead, and providing that where it exceeds the maximum value, and is indivisible, it shall be sold, and the maximum value set aside to the debtor. The cases cited by appellant uphold these statutes, but not a case is cited sustaining his theory where there is no such statute. But Downman is not a party to this suit (in equity), and no tender was ever made to him. Our statute provides the manner by which an officer shall levy on money coming to his hands, and in this case the statute was followed.

See also Freeman on Ex. 130.   The homestead right is not an absolute one.   Our courts have held that, under the statute of 1887, it is but a privilege which may be waived by the debtor.   53 Ark. 182; 55 *id.* 139; 57 *id.* 179.

All that Mrs. Simpson can claim as against creditors is an interest equal to the amount she paid on the property.   *Kline* v. *Ragland*, 47 Ark. 111.   She is estopped.   Sand. & H. Dig., sec. 727; 19 Ark. 543; 47 *id.* 226.   Downman was an innocent purchaser.

BATTLE, J.   On the first day of April, 1893, J. S. Simpson was, and at all times since has been, a citizen and resident of the State of Arkansas, and the head of a family.   During all this time he and his family resided upon lots 10 and 11 in block 5, in the town of Rector, in Clay county, in this state.   The value of these lots and the improvements thereon did not exceed the sum of $2,500, and the area thereof did not exceed one-fourth of an acre.   Previous to the time he entered into the possession of the lots, the Peters Shoe Company recovered a judgment in the Clay circuit court, at the August, 1892, term thereof, against him for $580.   At the August, 1893, term of the same court, J. W. Scuddar & Co. also recovered a judgment against him for $1,262.21. G. B. Oliver, who is an attorney at law, controlled both these judgments, and in January, 1894, caused an execution to be issued on the judgment in favor of the Peters Shoe Company, and placed it in the hands of R. L. Hancock, sheriff of Clay county, who levied upon the lots occupied by Simpson, and advertised the same to be sold on the 17th of February, 1894, to satisfy the execution.   On the day of the sale Oliver caused an execution to be issued on the judgment in favor of J. W. Scuddar & Co., and placed it in the hands of the same sheriff. The lots were sold on the day fixed, and H. H. Downman, a member of the firm of J. W. Scuddar & Co., bid

the sum of $2,000 for them, and he, being the highest bidder, became the purchaser thereof. He thereupon paid the $2,000 to the sheriff. Scuddar & Co. then demanded of the sheriff that he levy the execution in their favor on the sum of $1,316.68, the balance of the $2,000 remaining in his hands after the satisfaction of the execution in favor of the Peters Shoe Company, which he did, upon their giving a bond of indemnity, and immediately, upon the day of sale, paid it to them.

On the 31st day of July, 1894, Simpson instituted an action against B. B. Biffle, clerk of the Clay circuit court, R. L. Hancock, sheriff of Clay county, and James W. Scuddar & Co., in the said court on the equity side, and alleged substantially the forgoing facts, and that the lots sold constituted his homestead, and that he had tendered to the clerk and Scuddar & Co. $660 to redeem the property from the sale, and each of them had refused to accept; and offered to pay in court any sum necessary to redeem his homestead, provided he was only required to pay the judgment in favor of the Peters Shoe Company, and interest, penalty, and costs; and asked that the clerk and Scuddar & Co. be required to accept the $660 in redemption, or, in the event he is not entitled to redeem, that a judgment be rendered in his favor against Scuddar & Co. for the amount received by them. The defendants answered, and did not deny that $660 was tendered to the clerk and Scuddar & Co.; but it does not appear in the pleadings or evidence when the tender was made.

The foregoing facts were proved at the hearing, and the deposition of Simpson was read, in which he deposed that his wife purchased the lots sold, and paid $150 for them; that he erected a brick building thereon for a residence, and expended in its construction $1,300 of his own money, and that his wife contributed the remainder of the cost of the same, less $400; that fourteen rooms

of the building were at one time rented as a hotel, and the remainder was occupied by him and his family; that he intended, when he built it, to use it as a hotel, but was unable to furnish it, and was compelled to rent.

It was further proved that when the lots were levied on by the sheriff and before the sale, Simpson claimed them as a homestead, and filed a schedule, in which he stated that he purchased the lots, and occupied them as a homestead; and that the schedule was sworn to by him.

The court found that the lots were the homestead of Simpson, and that he resided upon them at the time of the rendition of the judgment in favor of Scuddar & Co., and that their judgment was no lien upon them, but that the one in favor of the Peters Shoe Company was; and that an amount equal to the sum paid to the latter company in satisfaction of the execution in its favor, and interest and penalty, had been tendered by Simpson in redemption. But the court, being of the opinion that so much of the $2,000 paid by Downman as remained in the hands of the sheriff after paying the Peters Shoe Company was subject to execution, nevertheless dismissed the complaint of Simpson, and rendered judgment against him for costs, and he appealed.

On the 19th day of April, 1895, H. H. Downman, who purchased at the sale under execution on the 17th of February, 1894, instituted an action of ejectment against Simpson and his wife to recover the possession of the lots bought by him at said sale. He alleged in his complaint that he acquired title to the lots in the manner we have stated. The defendants answered, and denied that the plaintiff was the owner of the lots, and alleged that the title thereto was in Annie Simpson, the wife of J. S. Simpson, and that A. B. Eason, in March, 1893, conveyed the lots to her by a deed, and that the name of J. S. Simpson, long after the execution and

delivery thereof, was inserted in the deed as a grantee therein; and that she was the owner of the lots in fee, and entitled to the possession thereof.

On motion of the plaintiff, the action was transferred from the Clay to the Craighead circuit court.

In the trial before a jury a deed executed by the sheriff of Clay county to the plaintiff, conveying to him the lots in controversy, was read as evidence; and it was shown that he acquired title in the manner before stated. The deposition of plaintiff was also read, in which he stated that he was the owner of the lots; that he did not know that Annie Simpson claimed to be the sole owner thereof, until he had paid the purchase money, or that the name of J. S. Simpson had been inserted in the deed after its execution and delivery, until after this action was instituted, and the first suit had been determined by the circuit court, and that he had the records examined as to the ownership of the lots before purchasing.

Annie Simpson testified in her own behalf as follows: "She purchased the lots in controversy, and paid for them with her own money. The deed was executed and delivered to her individually, and she kept it for some months in a drawer, among other papers. Simpson took it out, and had his name inserted as a grantee therein, and then had it recorded. When it was returned from the recorder's office, she discovered the change, but took no steps to correct it. She knew that her husband scheduled the property as his homestead. She read the schedule. She also knew that the property was advertised for sale under the Peters Shoe Company's judgment, but took no steps to prevent it. She never assented to her husband having his name inserted in the deed, but made no objections to it in the presence of any one except him."

J. S. Simpson testified substantially the same as his wife, and as follows: "He took the deed to a notary

public, who certified to the acknowledgment thereof. With the consent of Eason, the grantor in the deed, his name was interlined therein, and he was made to appear as one of the grantees. It was then recorded. When he took it home, his wife 'objected some,' but took no steps to correct it. The reason he had his name inserted was that he was wanting to borrow money to furnish the house built on the lots, and had made application for it in his own name. Afterwards he and his wife concluded to rent it, and not borrow. But they did mortgage it, sometime thereafter, to Adams, and the mortgage was recorded in Clay county.

"He sold a house and lot, which belonged to himself and wife, or to himself, he did not remember which, for $800, and used the money in paying for a brick house on the lots in controversy. In addition to this sum, he expended $500 of his own money, and his wife about $400 of hers, in paying for the same."

The deed from A. B. Eason to Annie Simpson was read as evidence; and it appeared on its face that it was executed to her and her husband; that is to say, Annie Simpson and J. S. Simpson.

The deposition of J. S. Simpson which was taken in the first mentioned suit, and the schedule filed therein, were read as evidence in the trial of this action for the purpose of contradicting Simpson.

The judge instructed the jury, over the objections of the defendants, as follows: "If you find from the evidence that A. B. Eason executed a deed to the lands in controversy to Annie Simpson, wife of the defendant, J. S. Simpson, and afterwards, and before the recording of the said deed, the name of J. S. Simpson was inserted therein, and the same was recorded with said interlineation, and she took no steps to have the same corrected on the record, or otherwise, and permitted the said J. S.

Simpson to use and to treat the property as the property of herself and J. S. Simpson, and treated the deed, after the name of J. S. Simpson had been inserted, as a genuine conveyance to J. S. Simpson and herself; and that the plaintiffs purchased said lands at an execution sale without the knowledge of said interlineation, then you will find for the plaintiff."

And the defendants asked and the judge refused to instruct the jury as follows: "The jury are instructed that if they find from the evidence that the defendant Annie Simpson purchased the land in controversy and took a deed of conveyance therefor in her own name, and the defendant J. S. Simpson, after the execution and delivery of the deed to her, changed the same by interlineation or adding the name of J. S. Simpson, as grantee, that would not vest any title in J. S. Simpson, and your verdict should be for the defendants."

"The jury are instructed that if they find from the evidence that the property in controversy was conveyed to J. S. Simpson and Annie Simpson, his wife, such conveyance would vest in them an estate in entirety, and an execution sale against the husband alone will not pass such a title to purchaser as will deprive the defendant Annie Simpson of the possession of the land during her lifetime."

And the judge modified the first of said refused instructions by adding these words: "Unless you further find from the evidence that the said Annie Simpson treated the deed, after the name of J. S. Simpson had been inserted as a genuine conveyance to herself and J. S. Simpson," and gave it as modified.

The jury returned a verdict in favor of plaintiff for the lots and assessed his damages at $100. Judgment was rendered accordingly; and defendants, after a motion for a new trial was filed and overruled, and exceptions were saved, appealed.

For the sake of convenience we have stated the facts, and will decide the questions, in the two cases mentioned, in one opinion.

The $660 tendered in the first action to redeem the lots was insufficient. According to the evidence, the lots were sold for $2,000, and $1,316.68 were left in the hands of the sheriff after the satisfaction of the execution in favor of the Peters Shoe Company, making $683.32 held by the sheriff to pay that execution, which was larger than the amount tendered.

Redemption from execution.

But J. S. Simpson insists that he has the right to redeem by paying the amount received in satisfaction of the execution in favor of the Peters Shoe Company and fifteen per cent. per annum thereon, and lawful charges. This contention is based upon the assumption that, the lots being his homestead, he was entitled to all of the purchase money remaining after the execution in favor of the shoe company was satisfied. Taking the assumption as true, it does not follow that he was entitled to a credit in the redemption of the lots for so much of the purchase money as he was entitled to according to the assumption. Under the statutes of this state, when any real estate, or any interest therein, is sold under execution, the debtor may redeem the same at any time within twelve months after the sale by paying to the clerk of the court from which the execution issued the purchase money, with fifteen per cent. per annum thereon, and all lawful charges. In this case the real estate was sold for $2,000, and purchased by H. H. Downman in his own name, and ostensibly for his own benefit. He paid the purchase money to the sheriff; and $1,316.68 of it were appropriated to the payment of an execution in favor of the firm of Scuddar & Co., of which Downman was a member, which then became the property of the firm, or, if not the property, the firm became liable for it, and it could not be used as a set-off against any debt or

liability to Downman in his individual right. *Collier* v. *Dyer*, 27 Ark. 478; *Houston* v. *Brown*, 23 Ark. 333. Consequently $2,000 and fifteen per cent. per annum thereon and lawful charges were necessary to redeem the lots, and Simpson's tender and offer to redeem were insufficient.

As the judgment in favor of the Peters Shoe Company was rendered before the lots were occupied as a residence, it was a lien on them, and they were subject to be sold to satisfy the same. The occupation of them on a day subsequent to the rendition of the judgment did not relieve them of the lien. *Reynolds* v. *Tenant*, 51 Ark. 84. But they were occupied by Simpson and his wife, as a residence, at, before, and ever since the time the judgment in favor of Scuddar & Co. was rendered. Whether held by him as a tenant in common or by the entirety with his wife, he was entitled to hold them as a homestead free from all liens of judgment rendered and executions issued thereon while so held. *Ward* v. *Mayfield*, 41 Ark. 94; *McGrath* v. *Sinclair*, 55 Miss. 89. The fact that he rented a part of the building on the lots as a hotel, and occupied the remainder, did not divest him of his right to hold them as a homestead. *Gainus* v. *Cannon*, 42 Ark. 503.

*Exemption of homestead.*

*Nature of estate.*

*Effect of renting part.*

If the lots were the homestead of Simpson at the time they were sold under execution, he was entitled to the surplus remaining after the satisfaction of the execution in favor of the Shoe Company, and to use it in acquiring another homestead. Should he abandon or never entertain the intention so to use it, while it remains his property, it will become subject to execution or other process as his personal property. *Mitchell* v. *Milhoan*, 11 Kas. 617; *Tillotson* v. *Wolcott*, 48 N. Y. 188. Having been received and appropriated by Schuddar & Co. to the payment of a judgment and execution in their favor, he was entitled to a judgment against

*When surplus of homestead exempt.*

them for the amount thereof and interest, provided the lots were his homestead at the time they were sold. *Mitchell* v. *Milhoan, supra.*

Finding that the lots were Simpson's homestead, the court, in the first action, erred in holding that the surplus was subject to execution.

In the action of ejectment instituted by Downman, the court improperly instructed the jury.

Estoppel by silence. When Eason conveyed the lots in controversy to Mrs. Simpson, he thereby conveyed to her all the interest and title he had in them.    The subsequent insertion of the name of her husband in the deed with the consent of her grantor did not divest her of any interest which she had acquired.    He had none to convey.

The mere failure of Mrs. Simpson to institute proceedings to correct her deed does not estop her from setting up the forgery of her husband, and claiming to be the sole owner of the lots.    Something more than mere silence or inactivity is needed to constitute an estoppel. As held by this court in *Bramble* v. *Kingsbury*, 39 Ark. 131, "equity does not require one having title to property to seek out a party who is about to purchase it from a supposed owner, and inform him of his title.   All that it requires is that he shall do no act, nor be guilty of any misleading silence, or apparent acquiescence, by which another may be entrapped into a transaction which he would not have entered upon if he had been advised of the objection."

As said by Mr. Bigelow : "It is not enough to raise an estoppel that there was an opportunity to speak which was not embraced; there must have been an imperative duty to speak.   Nor is any duty generated by the mere fact that a man is aware that some one may act to his prejudice if the true state of things is not disclosed.   To use an apt illustration of one of the judges, a man may become apprised of the fact that his

name has been forged to a negotiable instrument, and so become aware that some one may be led to purchase the paper by supposing the signature to be genuine, and yet he is not bound to proceed against the forger, or to take any steps to protect the interest of others whose claims he may know nothing of. So long as he is not brought into contact with the person about to act, and does not know who that person may be, he is under no obligation to seek him out, or to stop a transaction which is not due to his own conduct, as the natural and obvious result of it. If the party is present at the time of the transaction, it may be necessary for him to speak, if speaking would probably prevent the action about to be taken; if absent, his silence (or other conduct) must at least be of a nature to have an obvious and direct tendency to cause the omission or the step taken. Only thus can a duty to speak arise." Bigelow on Estoppel (5th Ed.), p. 595; *Anderson* v. *Hubble*, 93 Ind. 570; *Meley* v. *Collins*, 41 Cal. 663.

A conveyance of the lots in controversy to J. S. Simpson and Annie Simpson, his wife, would vest in them an estate in entirety, and a sale of the husband's interest would not divest the wife of the right of possession during her lifetime. *Branch* v. *Polk*, 61 Ark. 388.

<div style="float:right">Conveyance to husband and wife.</div>

It follows from what we have said that the instructions to the jury in the action of ejectment were erroneous and prejudicial.

Although no question in the two cases demands it, it may be well to say that if Mrs. Simpson was the sole owner of the lots in controversy, the homestead was hers, and that her husband was not entitled to the surplus remaining after the satisfaction of the shoe company execution.

For the errors indicated, the judgments in the two actions are reversed, and the causes are remanded for proceedings consistent with this opinion.

BUNN, C. J., (dissenting.)   As to whether or not
Mrs. Annie Simpson, by her conduct, was estopped
from denying that the two lots in controversy were held
by herself and her husband, J. S. Simpson, in entireties,
I do not desire to discuss, as that may possibly be for
future consideration, as the case now stands.   But
assuming, for the sake of disposing of other questions
at once, that the husband and wife were joint owners,
and held by entireties, I proceed directly to discuss the
husband's homestead and exemption rights and the pro-
ceedings by which he has been deprived of their benefits.
In Thompson on Homestead, section 165, after naming
various kinds of estates in lands out of which a home-
stead may be carved, that author says: "These ques-
tions have all, under various phases, addressed them-
selves to the courts.   It would seem, upon principle,
that they are questions with which the creditor can have
nothing to do.   If the debtor's estate is such as, under
general law, would be vendible under execution, it does
not lie in his (the creditor's) mouth to say that it will
not support a homestead."   If, in other words, the hus-
band's estate in these lots was subject to execution,
when not claimed as homestead (which these creditors
are estopped from denying), then the estate of the hus-
band in them is such as will support the claim of home-
stead, if so dedicated, and these creditors will not be
heard to controvert that right where it is properly
asserted.

According to the uniform rulings of this court, at
least wherever its rulings have been called for, almost
any interest in land, carrying with it possessory rights,
may be the subject of homestead exemptions.   See also,
*Deere* v. *Chapman*, 25 Ill. 612; *Conklin* v. *Foster*, 57 Ill.
107; *Bartholomew* v. *West*, 2 Dill. 293; *Randal* v. *Elder*,
12 Kas. 261; *Vogler* v. *Montgomery*, 54 Mo. 584; *Sears*
v. *Hanks*, 14 Ohio St. 301; *Watts* v. *Gordon*, 65 Ala. 546;

*Tyler* v. *Jewett*, 82 Ala. 93; *Rockafellow* v. *Peay*, 40 Ark. 69. In the last named case this court said: "An equitable estate was enough. Indeed, it is probable that the homestead exemption withdraws from the demands of creditors whatever interest the claimant has in the property dedicated to that use."

The homestead is a *right*, under the act of March 18, 1887, especially, and like almost any other right may be waived (*Snider* v. *Martin*, 55 Ark. 139), but it has not been waived in this instance.

In *Draffin* v. *Smith, ante*, p. 83, this court held, in regard to personal property exemptions, that the proceeds of the exempted property, sold by order of the court in vacation, in an attachment proceeding, belonged to the defendant, and could not be set-off by the judgment debt of the plaintiff in the proceeding, after the attachment had been dissolved, and suit for damages against. plaintiff and in favor of defendant had been sustained. This was on the ground that the proceeds of the sale of the exempted property partake still of the character of the property itself, and like it are also exempted.

It is not controverted, so far as I can ascertain, that the excess for which the lots were sold under the Peters Shoe Company execution belonged to Simpson, and that the same was not subject to the execution issued on the judgment of J. W. Scuddar & Co.

The first of these suits, that is to say, case No. 3049, is a bill in equity by appellant J. S. Simpson against R. L. Hancock as sheriff, B. B. Biffle as clerk of the circuit court, and J. W. Scuddar & Co. (of which firm H. H. Downman was a member), to redeem the lots in question from the sale under the execution of the Peters Shoe Company, calling for $600 interest and costs; and the record shows that he had made a tender of this amount to the clerk aforesaid, and also to J. W. Scuddar & Co., and also offered to pay this amount into court for

the purpose of redeeming from said sale, and that the money was refused by the clerk, and also by J. W. Scuddar & Co., and it seems that his offer to deposit in court was not accepted by any of the parties. He then instituted his suit to redeem.

It appears that the two judgments were controlled by the same attorney, and just immediately before and on the same day the sale was made under the first— the Peters Company judgment—execution was caused to be issued on the second judgment, which was in favor of J. W. Scuddar & Co. The sale under the first execution was made on the 17th of February, 1894, and the lots bid in by J. W. Scuddar & Co. for the sum of $2,000, an amount sufficient to cover both judgments and probable costs. Immediately, as stated, the second execution, having been issued, was put in the hands of the sheriff, and asked to be levied upon the surplus of the proceeds of the sale aforesaid, over and above the amount required to satisfy the first judgment, interest and costs; said surplus to be applied to the satisfaction of the second execution calling for the sum of $1,300 interest and costs. The sheriff demanded an indemnifying bond, which was given, and the levy on the fund in hand was made, and the fund immediately paid over to J. W. Scuddar & Co., to be applied towards the satisfaction of their judgment.

It appears that, at the instance of the purchaser, J. W. Scuddar & Co., the sheriff made his deed to H. H. Downman, one of the members of that firm, and upon that deed he instituted the second of these suits, that is to say, case No. 3269, against Simpson *et al.* Other facts will be stated in this opinion, as they become necessary.

It appears that execution on the Peters Shoe Company judgment had been stayed by defendant in October, 1892, and that and the judgment had been reinstated after

being destroyed by fire.    This fact somewhat affects the
action of the sheriff in making the sale and his return
of the executions.

The sheriff, in regard to the disposition of the pro-
ceeds of the sale, was, or should have been, governed by
the provisions of sec. 3103 of Sandels & Hill's Digest,
and accordingly, if the defendant had a right to stay the
execution, and had not exercised the right, the sale
should have been on a credit of three months, and the
excess over an amount sufficient to satisfy the Peters
Shoe Company should have been covered by a bond from
the purchaser to the defendant, payable in three months,
and if a stay of execution was not allowable, or had been
already had, then the sale might have been for cash, but
the excess should have been paid over at once to the de-
fendant, unless it was subject to the levy of the second
execution, the one in favor of J. W. Scuddar & Co.

So the controlling question at last is whether or
not the excess in the hands of the sheriff was subject to
the second execution, and I think it was not any more so
than was the homestead before the sale; and if this
excess was not subject to be taken under that execution,
it was the duty of the sheriff to pay it over to Simpson
at once, and this duty is none the less a duty because
J. W. Scuddar & Co. indemnified the sheriff.    That is a
matter between them which Simpson can make use of or
not in asserting his rights against both of them.

The clerk and the plaintiff in execution, and appar-
ently the sheriff, all contest Simpson's right of redemp-
tion, because he did not tender the full amount for
which the lots sold, namely $2,000, in redemption of the
property, and their refusal to accept the amount due on
the Peters Shoe Company judgment is sustained, in
effect, by the majority of the court.    In other words,
the sheriff having at once paid over to J. W. Scuddar
& Co. the excess, and they, having received it (that is to

say, having appropriated to their own use a fund belonging to defendant), now resist his application to redeem, unless he tenders the same amount to them over again. The question is, what becomes of Simpson's homestead rights? Whatever may be the theory of it, practically, J. W. Scuddar & Co. as plaintiffs in an execution, which is confessedly no lien upon the homestead, will have collected their debt out of the homestead nevertheless, for it does not appear just how Simpson could ever get his money back had he tendered and paid this excess over to J. W. Scuddar & Co. The simple truth is, by preventing the sheriff from paying the excess over to Simpson, they have deprived Simpson of the right, or the privilege, and perhaps the ability, to make such a tender as all these parties have demanded of him, and Downman is one of them.

There is no way pointed out by statute for a defendant in execution to protect himself in this peculiar situation. The fund is not personal property, because it still partakes of the character of the homestead; and it is not real estate, so as to be dealt with as real estate in every particular. If it be considered as personal property, the excess is more than the personal exemption, and that theory would fail. My opinion is that Simpson has adopted the true and only course for asserting his rights which one could under the circumstances, and the decree of the lower court should have been reversed, and the decree entered here for him.

I have not considered the question whether or not Simpson fraudulently deprived himself of means to pay his debts by expending them all upon the improvement of his homestead. In a proper case I should consider that as a very important question, but it is not involved here.

This view would settle the case No. 3269, as the parties thereto were affected with notice of the right of defendant and his suit from the beginning.